C. E. TUTTLE, Petitioner, v. EARL PETERS, Judge, Respondent.

JUNE 26, 1928.

*Stipe, Davidson & Davidson, Paul W. Richards*, and *Lester L. Orsborn*, for petitioner.

*Floyd E. Billings*, County Attorney, and *C. E. Swanson*, for respondent.

DE GRAFF, J.—This is a proceeding in certiorari. The primary proposition involves the sufficiency of the evidence to sustain the contempt charged. Before reviewing the record evidence, the controlling rule of the case may be stated, and for this purpose it is sufficient to quote the language in *Andreano v. Utterback*, 202 Iowa 570.

"The search is to find the evidence to sustain the act charged, and it is for this court to say, having due regard for the findings of the lower court, but without viewing the findings as conclusive, whether or not the facts in any case before us clearly and satisfactorily establish and constitute the contempt."

In the instant case, there is a decided and irreconcilable conflict in the evidence, and, under the doctrine as announced in *Rist v. District Court*, 162 Iowa 244, there is such a conflict "that we should not interfere with the finding of the district court."

Keeping in mind the decisive rule in a case of this character, we inquire: Does the evidence establish that the petitioner was guilty of contempt in that he violated the terms of an in-

junction entered on March 3, 1924? This injunctional decree was valid, and by its terms the petitioner was perpetually restrained and enjoined from maintaining a liquor nuisance on certain described real estate in Red Oak, Iowa, or elsewhere within the state of Iowa. On January 9, 1928, a sworn information was filed by Floyd E. Billings, in which it is averred that C. E. Tuttle (petitioner herein) on the 20th and 25th days of December, 1927, violated the terms and conditions of said injunctional order and decree (set forth in a preceding paragraph of the information), and ''at said times sold intoxicating liquor to Lewis Martin and Orville Swim, contrary to said order and decree above referred to, as shown by affidavits of Lewis Martin, Orville Swim, and Guy H. Hobbs, attached hereto, and marked Exhibits A, B, and C, and made a part hereof by reference.'' The affiant prayed that a warrant issue for the arrest of said defendant, and that he be punished for contempt.

The affidavit of Lewis Martin recited that he was 16 years of age; that he lived with his father, 5½ miles northeast of Villisca; that, on the evening of December 20, 1927, in company with Orville Swim, he drove his father's car to Red Oak, Iowa; that he drove to Deputy Sheriff Guy H. Hobbs's home, and later went to the county attorney's office; that, after they left said office, they drove the car to C. E. Tuttle's home, in the northeast part of Red Oak, and honked the horn, and a lady there wanted to know what they wanted; that they told her they wanted to see Tuttle, and they were informed that he was at the hotel, at the broadcasting station; that they drove away, and later came back to Tuttle's home and honked the horn, and the lady again appeared, and they were told that Tuttle would be back in about 15 minutes; that they later returned to the Tuttle home and honked the horn, and Tuttle came out to the car; that he was told that they wanted a half gallon of alcohol; that he asked who they were, and where they came from, and was told; that Tuttle said they looked all right, left, and went to the house, and when he returned, he handed them a one-gallon can and Swim handed him some currency; that they then drove away, went to the county attorney's office, turned the can over to Deputy Sheriff Hobbs, who placed a paper on the can; that they signed their names on the paper; that, on the evening of December 25, 1927, they again drove to Red Oak, went to

Deputy Hobbs's home, talked with him, and then drove the car to Tuttle's home; that Tuttle came out, and he was asked if they could get another one-half gallon of alcohol; that there was a brief conversation, and Tuttle went into the house, came back, and handed a gallon can to Swim, who counted some money and handed it to Tuttle; that they drove away, met Deputy Sheriff Hobbs, and turned the can over to him; that they later drove to the county attorney's office, which was locked; that they then drove to Villisca, got something to eat, and drove to Orville Swim's home; and that the affiant, after driving to the house of Deputy Sheriff Hobbs, drove to his own home.

The affidavit of Orville Swim recited that he is 21 years of age, unmarried, and lives 12 miles east and three quarters of a mile north of Red Oak. His affidavit recited, in substance, the same facts as contained in the affidavit of the affiant Martin.

The affidavit of Deputy Sheriff Hobbs, of Montgomery County, recites that he has been a deputy sheriff for five years last past, and further states that the boys, Martin and Swim, on the evening of December 20, 1927, came to his house, and a little later left, and thereafter came back, and that he and the two boys went to the county attorney's office; that the boys left to go to Tuttle's home, to see if they could buy a half gallon of alcohol; that he waited in the office until they returned; that they did return, and handed him a gallon can; that he sealed the can, and put a sticker on one side thereof, and both Martin and Swim signed the sticker; that later that night, the can was put in the vault of the courthouse; that, on the evening of December 25, 1927, Martin and Swim came to his house again; that some talk was had about making a buy of liquor from Tuttle, and that, before the boys started away from his house, the Martin car was searched, to discover the presence of any liquor; that he waited for the boys on Eastern Avenue, where the boys handed him a gallon can; that the boys were told to go to his house and wait; that he then drove to the Tuttle house and rang the doorbell; that Tuttle came to the door, turned on the porch light, and then started for the back part of the house; that he waited a short time, and then went across the street, and asked a Mr. Penry for a tire pump; that later, he saw Tuttle, and talked to him; that, later in the evening, he drove to Swim's house, and had a talk with Swim and Martin; that a sticker was placed on

the can which he had received from them, and that Swim signed his name thereon; that this can was later placed in the vault in the basement of the courthouse. The liquor in the cans was analyzed by Professor J. E. Galloway, of the Des Moines College of Pharmacy, and showed by volume 85.74 per cent absolute alcohol, and by weight 80.29 per cent, in one can, and by volume 78.61 per cent absolute alcohol, and by weight 71.96 per cent, in the other can.

The defense of the petitioner offered upon the trial of this cause is in the nature of an alibi for both of the nights to which the affidavits refer. Consequently, the question is: Whom shall the court believe? It may not be said, under the record facts, that the three affiants and the defendant, with certain of his witnesses, are all telling the truth. Both sides cannot be believed.

It is shown that, on December 31, 1927, the petitioner went to the home of Charles L. Barton, a wholly disinterested witness, and at said time had a conversation with Barton, in which conversation the petitioner admitted that he did sell liquor to the boys, and asked Barton if he knew Swim and Martin, and if he was going to Villisca that night. An affirmative answer was given by Barton to both of these questions. Later in the evening, Barton saw the petitioner in a pool hall at Villisca, and the petitioner inquired if Barton had talked with the boys. The petitioner again saw Barton on the following Tuesday, and Barton asked him where the boys were, to which the reply was made that they were in Omaha, and in good hands. Barton again saw the petitioner at a subsequent time, and the petitioner asked him what he was going to tell, if called as a witness, and the petitioner was informed by Barton that he was going to tell the truth; to which the petitioner replied that "it would make it kinda bad." The petitioner further asked Barton if he was going to say that these boys had double-crossed him, to which Barton replied that he was not; and the petitioner told Barton that the boys were to get $50 apiece and expenses.

An interesting item of evidence, on which considerable emphasis is placed by the petitioner, discloses that Martin and Swim later made affidavits in Omaha in which they retracted the statements recited in the affidavits attached to the sworn information filed by the county attorney. The time, circumstances, and antecedent history connected with the making of the second

affidavits by Martin and Swim are fully disclosed in this record. It appears that, on the evening of December 31, 1927, Martin and Swim were in Villisca, and that the petitioner had a conversation with Swim, wherein he asked Swim how much he would take to go away from Villisca for a week. The petitioner offered $35, but Swim answered that he would not go for that sum, and petitioner then said he would give him $50. Later that evening, Swim and Martin left Villisca in a car driven by the petitioner, accompanied by three parties named Jack Ryarson, Carl Wheeler, and Jap McMichel. They drove to Red Oak, and Martin and Swim were taken to the home of Ryarson in petitioner's car. A short time later, Wheeler, McMichel, and one Harry Neal came to Ryarson's home, and from there they drove to Omaha, taking Martin and Swim with them.

On Monday, January 2, 1928, Martin and Swim were taken to a room in the Fontanelle Hotel by Wheeler and McMichel, where the petitioner was found. Martin and Swim were told that some attorneys were coming, and later the attorneys did come, and on the afternoon of that day, the boys were taken to the office of an attorney in Omaha, where affidavits were made by both Martin and Swim, in which recitals were made which are decidedly at variance with their prior affidavits.

Upon the trial of this cause, both Martin and Swim told the court the same story as to their dealings with Tuttle in the purchase of alcohol as they told in their first affidavits. They also explained their trip to Omaha, and disclosed the connection of the petitioner with that trip.

We deem it unnecessary to enter into further details connected therewith. It would be profitless to elaborate on the affidavits made by Martin and Swim at Omaha. The hand of the petitioner in this matter is plainly shown. It was a high-handed attempt to sidetrack these witnesses and to induce them to tell a different story. They were transported by the petitioner from the state of Iowa to Omaha, Nebraska, and there kept under the surveillance of the petitioner and his attorneys. We can reach no other conclusion than that the change of statement of these young men is directly traceable to the influence and promises made by the petitioner. It is strikingly strange that, if these witnesses, Martin and Swim, were desirous of making a statement, as set forth in the Omaha affidavits, they should have been

taken to a foreign jurisdiction, in order to make said affidavits. We have no hesitation in accepting the statements of Deputy Sheriff Hobbs as the very truth of the transaction to which his testimony relates.

It is the further claim of the petitioner that he did not leave his home on the evening of December 25, 1927. The petitioner denies that he had a conversation with Sheriff Hobbs in the street in front of the Tuttle residence. It is conclusively shown by the petitioner's own witnesses that the deputy sheriff had a conversation with "someone" in front of said home on the evening of December 25th. This conversation had to do with a tire pump; and to meet this situation, and to establish the defendant's alibi that he did not leave "the four walls" of his home on the evening in question, Roy Allen, brother-in-law of the petitioner, and employee of the petitioner, was called. The brother-in-law testified that it was he who had this talk with the deputy sheriff, and that in said conversation he learned that the deputy sheriff had a flat tire. It was a bold stroke on the part of the petitioner, but, under the facts, we will not mince words. We view the testimony of Allen as pure fabrication. In brief, the trial court was fully justified in disbelieving the testimony of the defendant and his witnesses, bearing on the attempted alibi of the petitioner on the night in question.

A careful review of the evidence satisfies this court, as it did the respondent court, that the petitioner was guilty of contempt, as charged in the filed information. Wherefore, the writ of certiorari issued herein is—*Annulled*.

STEVENS, C. J., and ALBERT, MORLING, and WAGNER, JJ.. concur.